**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JILL WEZOREK,** | : | **CIVIL ACTION** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **ALLSTATE INSURANCE COMPANY,** | : | **NO. 06-CV-1031** |
| **Defendant** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **CHRISTOPHER BAROSH,** | : | |
| **Counterclaim Defendant** | : | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**TIMOTHY R. RICE**                                                          **August 6, 2007**
**U.S. MAGISTRATE JUDGE**

This homeowner's insurance coverage dispute raises myriad issues, most of them focusing on the conduct of counterclaim defendant Christopher Barosh, whom the parties agree is the central player in this case. Depending on whose evidence is credited, Barosh could be viewed as either: (1) entrepreneur or exploiter; (2) fiancé or philanderer; (3) naif or manipulator; and/or (4) victim or arsonist. I am neither required nor able to resolve all of these conflicts.

Instead, I find, as set forth more fully below, that Barosh and plaintiff/counterclaim defendant Jill Wezorek were not credible at trial. Wezorek cannot establish by a preponderance of the evidence that defendant Allstate Insurance Company ("Allstate") breached a contract to insure the contested property, or by clear and convincing evidence that Allstate acted in bad faith in denying coverage. I also find Allstate proved by clear and convincing evidence that Barosh and Wezorek violated Pennsylvania's insurance fraud statute through misrepresentations made on the insurance application and during the investigation of the claim.

**Factual Findings**[1]

1.      In 2005, Barosh was familiar with the City of Philadelphia's blight removal

program, the Neighborhood Transformation Initiative ("NTI"),[2] through demolition contracts he

had received.  N.T. 6/25/07 at 18-21.  In 2005, Barosh was an officer of Jack, Inc., which was

involved in bidding for government contracts and NTI demolition work.  N.T. 6/25/07 at 168-74.

Barosh had performed demolition work in the Southwest Philadelphia neighborhood where the

contested property was located.  Id.

2.      Based on his knowledge of the NTI program and its benefits, Barosh arranged for

his girlfriend and fiancée Jill Wezorek to purchase the contested property, which was within the

area targeted for blight elimination.  N.T. 6/25/07 at 19.

3.      Barosh and Wezorek sought favorable tax benefits from Wezorek's ownership of

the property, and hoped to renovate the property for rental or resale.  N.T. 6/25/07 at 158, 257-

58; N.T. 6/26/07 at 135-36, 145.

4.      Wezorek became the owner of the property located at 1148 South 54th Street,

Philadelphia, Pennsylvania by a "Quick Claim Deed,"[3] dated July 12, 2005.  Ex. P-1.  Barosh,

through power of attorney for Wezorek, signed the deed.  Id.; N.T. 6/25/07 at 24-35.

---

[1]  In addition to resolving legal issues, my role in a bench trial includes evaluating the credibility of witnesses and weighing the evidence.  See Fed. R. Civ. P. 52(a); Inwood Laboratories, Inc. v. Ives Laboratories, Inc., 456 U.S. 844, 856 (1982).

[2]  Philadelphia's Neighborhood Transformation Initiative has been described as "a strategy to rebuild Philadelphia's neighborhoods as thriving communities with clean and secure streets, recreational and cultural outlets, and quality housing.  Among the central goals of NTI are to eradicate blight caused by dangerous buildings, debris-filled lots, abandoned cars, litter and graffiti, and to promote redevelopment through large-scale land assembly."  In re Redevelopment Authority of City of Phila., 891 A.2d 820, 832 n.3 (Pa. Commw. 2006).

[3]  The document is mislabeled "quick claim."  The correct term is "quitclaim" deed, which "conveys a grantor's complete interest or claim in certain real property but . . . neither warrants nor professes that the title is valid."  Black's Law Dictionary (8th ed. 2004), deed.

5.      Control of the property shifted from Wezorek to Barosh's demolition corporation, Jack, Inc.  On September 20, 2005, Wezorek executed a power of attorney authorizing Jack, Inc. and two of its representatives - - one of whom was Barosh - - to "transact business with sale, mortgage, and insurance. . ." regarding the property at 1148 South 54th Street.  Ex. D-47; N.T. 6/25/07 at 135-38.

6.      Barosh and Wezorek entertained many options for making a profit on the property, including mortgaging, leasing, or selling the property.  N.T. 6/25/07 at 158.

7.      Barosh attempted to lease the property to Yolanda Dingle for a year, beginning in August, 2005.  See Ex. D-13 (un-executed lease).  Barosh even accepted a security deposit from Dingle.  See id.; N.T. 6/25/07 at 47.  Instead of listing Wezorek as landlord, the lease listed Jack, Inc. as landlord.  Ex. D-13.

8.      Barosh told Erik Melling - - who had invested a substantial sum of money in another company run by Barosh - - that the home at 1148 South 54th Street would be "flipped"[4] or rented so Barosh could make money to repay investors to whom he owed money.  N.T. 6/26/07 at 133-36, 145.

9.      In early October, 2005, Barosh contacted Larry Lanci of Mercury Real Estate and listed the home for sale.  N.T. 6/26/07 at 172-76.  Barosh instructed that the home be listed as a duplex.  N.T. 6/26/07 at 174-75.  The home was available for immediate sale.  N.T. 6/26/07 at 176.

10.      Prior to purchasing the premises, Wezorek, who lived near Reading, Pa.,  had never visited the Southwest Philadelphia neighborhood and never saw the home located there. N.T. 6/25/07 at 154-55, 6/26/07 at 5-6.  Wezorek relied on Barosh's judgment in purchasing the

_____

[4] "Flip" is a term used in the real estate business for the practice of purchasing property below market value, making needed repairs, and swiftly reselling the property for a profit.

premises.

11.     Wezorek never lived at the premises, and visited only twice.  N.T. 6/26/07 at 17-18.

12.     Wezorek fully supported all of Barosh's actions, and continued to do so as of the date of trial.  N.T. 6/26/07 at 4-5, 39.

13.     In early September, 2005, Barosh, on behalf of Wezorek - - who testified she was busy working in Reading - - sought homeowner's insurance for the premises through Allstate agent Roman Torres.  N.T. 6/25/07 at 41-43; Ex. D-49 (Sept. 8, 2005 email from Barosh to Torres).

14.     In a September 8, 2005 email to Torres, which purports to revisit topics previously discussed, Barosh gave Torres information concerning a mortgage on the property, and said the policy was needed as soon as possible to close on the mortgage.  Ex. D-49.  Barosh also falsely represented that he and Wezorek were co-owners of the property.  Id.

15.     Relying on information provided by Barosh, Torres started an application for Wezorek's Deluxe Plus homeowner's policy.

16.     On September 9, 2005, Barosh met with Wezorek to review the insurance application with her so she could sign it.  Wezorek signed the required pages of the application and faxed them back to Torres.  Ex. D-23 at 34; Ex. P-22; N.T. 6/25/07 at 67-69, 267-68.  The "Deluxe Plus" homeowner's policy, number 908753624, became effective on September 10, 2005.  See Ex. D-21.

17.     Wezorek signed the application knowing it contained inaccurate information.  See N.T. 6/25/07 at 268.

18.     Other than copies Torres had requested, e.g., a copy of Wezorek's driver's license, the signed application pages, and the credit authorization, Barosh and Wezorek did not fax any

-4-

other correspondence to Torres.  Ex. D-23 at 36-37; <u>see</u> Ex. D-22 (Torres' file contains no additional faxes from Barosh and Wezorek).  Wezorek and Torres spoke once by telephone to deal with payment and credit card issues.  Ex. D-23 at 15, 35.

19.    Wezorek and Barosh had no further correspondence with Torres concerning the insurance application.  <u>See</u> Ex. D-23 at 37; <u>see also</u> <u>infra</u> Finding No. 40.

20.    Exhibits P-4 and P-5, which Barosh and Wezorek testified they sent to Torres to correct information on the insurance application, were never faxed, hand-delivered, mailed, or in any way sent to Torres.  <u>See</u> <u>infra</u> Finding No. 40.  Wezorek and Barosh did not attempt to disabuse Torres of the incorrect information on the application.

21.    The insurance application was forwarded to Allstate's underwriting department in Ohio.  The underwriting department determined the age of the home on the premises did not qualify Wezorek for the Deluxe Plus policy, which covers only those homes under 40 years old.  N.T. 6/26/07 at 187-88, 195, 198-99.

22.    On September 16, 2005, Allstate's "Notice of Cancellation" letter notified Wezorek that the policy would be cancelled effective October 27, 2005 because the home was too old for a Deluxe Plus policy.  Ex. D-22; Ex. P-6; Joint Pretrial Stipulation, para. 4, 5; N.T. 6/25/06 at 88, 6/26/07 at 187-89.

23.    Allstate provided notice of the cancellation within 60 days of the issuance of the policy.  Joint Pretrial Stipulation, para. 4; N.T. 6/26/07 at 187-89.

24.    The policy cancellation was not challenged.  N.T. 6/26/07 at 189.

25.    Wezorek did not attempt to reapply for a different type of homeowner's policy with Allstate.  N.T. 6/25/07 at 128-29.  Instead, Wezorek applied for homeowner's insurance with a broker for The Philadelphia Contributionship Insurance Company.  <u>Id.</u> at 128-33; Ex. P-13.  Wezorek signed the new insurance application on October 19, 2005.  Ex. P-13.

26.     Wezorek's signed application with The Philadelphia Contributionship represented that "no vacant, vandalized or commercial buildings" were near the premises.  Ex. P-13.  The application also represented that there were no cancelled or non-renewed insurance policies for the premises within the last three years.  Id.

27.     Next door to the premises is a small "Chinese" store, which has an ATM.  Ex. P-9 (withdrawal from ATM at 1150 S. 54th Street); N.T. 6/25/07 at 202.  The store has a large sign that reads in part: "Hoagie[,] Hot Dog."  Ex. D-43a, P-3.

28.     Exhibit P-14, which Barosh testified was his attempt to change incorrect information on the Philadelphia Contributionship insurance application, left unchanged the representations that "no vacant, vandalized or commercial buildings" were near the premises and that no policy was cancelled or nonrenewed within the previous three years.  See Ex. P-14; N.T. 6/25/07 at 214.  Wezorek's signature appears under the representation.[5]  Ex. P-14.

29.     On October 25, 2005, two days before the Allstate policy was to lapse, a fire at the property was reported to the Philadelphia Fire Department at 11:22 p.m.  Joint Pretrial Stipulation, para. 6; N.T. 6/26/07 at 59.  The fire was incendiary, and was set shortly before the fire was reported.  Joint Pretrial Stipulation, para. 7; see N.T. 6/26/07 at 58, 113-14, 233, 245; Ex. P-8, D-2, D-3.  The fire started from an open flame, and the burn patterns were consistent with the ignition of a flammable liquid that had been poured on the basement floor.  N.T. 6/26/07 at 245, 249.  Floor samples tested positive for gasoline.  Id. at 255.

30.     Barosh reported the fire to Allstate on October 26, 2005.  Joint Pretrial

_____

[5] On December 1, 2005, the Philadelphia Contributionship notified Wezorek the policy was cancelled ab initio based on the misrepresentation that no commercial buildings were nearby.  Ex. P-13.  Moreover, the policy was cancelled because the property appeared to be vacant and fire damaged.  This is unsurprising given the fire on October 25, 2005, which destroyed the premises only two days before the Allstate policy was scheduled to lapse.

Stipulation, para. 8; N.T. 6/27/07 at 209.

31.     Allstate assigned claim number 5133186352 to the claimed fire loss.  Joint

Pretrial Stipulation, para. 9.  An investigation, which involved the following, was then

commenced:

A.     Investigatory services of Joseph Nangle, a former Pennsylvania State

Trooper turned private investigator, who took statements from Barosh and Wezorek, canvassed

the neighborhood, attempted to interview Yolanda Dingle, visited the Blue Moon Hotel, and

visited the Department of Licenses and Inspections.  N.T. 6/27/07 at 73-80, 103, 106-107.

B.     A claims adjustor visited the home where he took pictures and inspected

the home.  N.T. 6/26/07 at 210; see Ex. D-43.  The claims adjustor found minimal contents in the

home.  N.T. 6/26/07 at 212.

C.     A recorded statement of Roman Torres was taken.  N.T. 6/27/07 at 107-

110; Ex. D-23.

D.     Fire expert Louis Gahagan was hired to investigate and determine the

cause of the fire.  N.T. 6/26/07 at 232; Ex. D-3.  He found the fire to be caused by an open flame

applied to gasoline.  N.T. 6/26/07 at 245, 249, 255.

32.     When Allstate determined questions existed concerning whether Allstate would

cover the claim, it sent Wezorek a reservation of rights letter communicating the concern.  N.T.

6/27/07 at 110; Ex. D-36 (Nov. 11, 2005 letter).

33.     The insurance policy at issue here provides:

> Concealment or Fraud
>
> This policy is void if it was obtained by misrepresentation, fraud or
> concealment of material facts.  If it is determined that this policy is
> void, all premiums paid will be returned to you since there has
> been no coverage under this policy.

> We do not cover any loss or occurrence in which any insured person has concealed or misrepresented any material fact or circumstance.

Joint Pretrial Stipulation, para. 11; Ex. D-1.

34.     After Allstate's investigation of claim number 5133186352, Allstate notified Wezorek, by letter from Nancy Rosen on February 17, 2006, that Allstate voided the insurance policy ab initio.  Joint Pretrial Stipulation, para. 12; Ex. P-11; N.T. 6/25/07 at 121.  The letter notified Wezorek that Allstate would not be liable for any claims or damages under the voided policy.  See id.  The letter detailed the following deficiencies: (1) Wezorek and Barosh represented on the application that the home was purchased in September, 2005, when it was purchased in July, 2005; (2) the application stated the home would be owner occupied within 30 days, but it was not; (3) the home had no prior insurance; and (4) due to extensive renovations the home could not have been owner occupied within 30 days.  Ex. P-11.

35.     Allstate's termination of the policy ab initio was not premised on the incendiary nature of the fire.  N.T. 6/27/07 at 140.

36.     After voiding the policy, Allstate refunded the policy premiums to Wezorek, who never negotiated the refund check.  Joint Pretrial Stipulation, para. 13, 14.

37.     I find Barosh and Wezorek made the following misrepresentations to Allstate:

        A.      No nonresidential properties, including stores, were within 40 feet of the property.[6]  Ex. D-22 (Wezorek initialed the application page that included the assertion); Ex. D-

---

[6] Exhibits P-4 and P-5, which purport to notify Torres of mistakes on the insurance application - - even though allegedly sent after Wezorek signed the application - - respond only to the application deficiencies cited in Allstate's notification that the policy was voided ab initio. The alleged correspondence does not correct the misrepresentation that no commercial buildings are within 40 feet of the property.  Because these letters were produced only after Torres' unavailability at trial was known to Wezorek and Barosh, it is not surprising that the letters appear to be perfect responses to Allstate's written justifications for voiding the policy. Accordingly, I decline to credit P-4 and P-5.

23 at 30-31 (Barosh told Torres no stores were within 40 feet of the property); N.T. 6/26/07 at 36; Ex D-43a (store pictured next door to the home); N.T. 6/25/07 at 96, 202 (Chinese store is next door to the house).

    B.  Wezorek intended to reside in the contested property within 30 days.  I reject the testimony of Barosh and Wezorek that they were prospective newlyweds hoping to settle within the NTI district and reside in a property that had recently been purchased by quitclaim deed for only $10,000 and was undergoing extensive renovations.  As a result, I find Wezorek, acting through, and with the assistance of, Barosh, falsely represented on the insurance application that she intended to reside in the contested property within 30 days.  Ex. D-22 (Wezorek initialed the application); N.T. 6/26/07 at 36-37; Ex. D-23 at 16, 18, 27-28, 31-32.

    C.  The applicant, Wezorek, had moved into the property in September, 2005.  Ex. D-22 (first page of application); Joint Pretrial Stipulation, para. 2 (Wezorek never lived in the house); N.T. 6/25/07 at 154 (Wezorek never spent a night in the house); N.T. 6/26/07 at 62 (the home was not in liveable condition).

    D.  The property was purchased in September, 2005.  Ex. D-22 (application, page 3); Ex. P-1 (purchase in July, 2005); N.T. 6/25/07 at 24; Ex. D-23 at 16 (Barosh told Torres the property was purchased in September); <u>see</u> Ex. D-49 (September email from Barosh to Torres explaining that the policy was needed immediately so a mortgage could be obtained).

    E.  The purchase price of the home was $70,000.  Ex. D-22 (application, page 3); Ex. D-49 (email to Torres regarding $72,000 mortgage); Ex. D-23 at 26 (Barosh supplied Torres with the purchase price of $70,000); Ex. P-1 (deed listed $10,000 as the consideration).

    F.  The home had new fire alarms.  Ex. D-49 (email to Torres); Ex. D-22 (application, page 4); Ex. D-23 at 28-29; N.T. 6/25/07 at 125 (new fire alarms were not yet

installed).

38.     Had Allstate known the property would not be owner occupied within 30 days, it would not have issued the homeowner's policy.  N.T. 6/26/07 at 190; N.T. 6/27/07 at 115-17.

39.     Had Allstate known the property did not have prior insurance, it would not have issued a policy for the premises.   N.T. 6/26/07 at 192-93; N.T. 6/27/07 at 115-117.

40.     My adverse credibility findings of Barosh and Wezorek are based on my first-hand observations of their demeanor and tone, along with the following factors:

A.     Barosh and Wezorek provided Allstate with additional documents - - Exhibits P-4 and P-5 - - only after discovering Allstate insurance agent Torres was unavailable for trial and could not be located.  See e.g. N.T. 6/27/07 at 103 (Allstate's lead investigator, Nancy Rosen, who had interacted with Wezorek, Barosh, and their counsel, was never told, prior to the discovery of Torres' unavailability, about the faxes Wezorek and Barosh produced upon learning Torres would not be available at trial); Ex. D-23 at 36-37 (Torres did not receive anything back from Wezorek and Barosh other than the materials requested).  These documents bear no cover sheets or fax indicia to support the testimony of Barosh and Wezorek that they in fact sent the documents to Torres.  See Ex. P-4, P-5.

I expressly discredit the testimony of John McCarty, who claims he retained the original of Ex. P-5, one of the contested documents, after hand delivering a copy to Torres.  McCarty had significant bias to support Barosh based on his business relationship with Barosh and on Barosh's assistance to help McCarty when he was recovering from his drug addiction.[7]  See N.T.

---

[7] Wezorek's proffered reason for signing the completed application and later submitting changes to Torres is incredible.  Wezorek claimed she is accustomed to writing down instructions for her Hispanic optometry patients, and that due to Torres' "thick accent" she felt the need to submit changes on another document. N.T. 6/25/07 at 265, 268.  I have listened to Torres' recorded statement and find Wezorek's description of Torres' accent to be exaggerated,

6/25/07 at 223-24, 246-48.

I find it highly suspicious that both Ex. P-4 and P-5, which together attempt to undercut each reason Allstate proffered to void the policy ab initio, were produced only after Wezorek and Barosh learned Torres was unavailable, especially considering Ex. P-4 is alleged to have been found in Wezorek's office.

      B.     Wezorek claims to have agreed to relocate from Reading, Pennsylvania, to the contested property without ever visiting it.  Wezorek claimed she was going to leave her practice as an optometrist in the Reading area to either open a practice or join an existing practice in the Philadelphia area.  N.T. 6/25/07 at 263-64.  Wezorek testified she was looking to move in November, 2005.  Id.  Wezorek, however, did not tell her employer she would be leaving.  Instead, in September she gave verbal notice that she was thinking of leaving.  Id. at 284.  Because she was required to give 30-days notice to her employer, if Wezorek had been planning to move in November, she would have given formal notice in October that she intended to move.  See N.T. 6/25/07 at 263.  The fire would not have affected this notice.[8]  After the fire, Wezorek obtained a three-month lease, and, in January, 2006, eventually relocated to Lansdale, Pa., not Southwest Philadelphia.[9]  Id. at 282-83.  A year later, Wezorek moved to Quakertown, Pa., where she now resides.  Id.

      C.     Wezorek showed little interest in the home.  Other than viewing

---

and Wezorek's explanation to be incredible.

   [8] Even if Wezorek's testimony concerning Ex. P-4 were credited, her actions did not match her words.  In Ex. P-4 Wezorek allegedly told Torres she would move in 60 days.  Sixty days from the date of the letter is November 8, 2005.  Thus, by October 9, 2005, Wezorek would have had to give her employers notice that she was actually leaving.  The fire on October 25, 2005 would not have affected this notice.

   [9] At some point, Wezorek and Barosh abandoned their contemplated marriage.

-11-

photographs provided by Barosh, she never saw the house before it was purchased.  N.T. 6/26/07 at 6.  She did not know the date when the house was purchased.  Id.  She did not know the purchase price.  Id.  She was unaware of an oral agreement that any outstanding liens would be deducted from the $10,000 consideration to be paid for the property.  Id. at 7.  She first saw the deed a substantial time after it was recorded.  Id.  She did not know Barosh considered mortgaging the property.  Id.  Wezorek was not aware Barosh had prepared a lease with Yolanda Dingle's name on it.  Id.  She did not know Barosh had entered an agreement to list the property for sale.  Id. at 8.  She gave Barosh the responsibility to find homeowner's insurance, and she never met with an insurance agent.  Id.  Finally, Wezorek was never aware the fire was deemed incendiary.  Id. at 8-9.

       D.    Barosh's version of events on October 25, 2005, the night of the fire, is incredible and contradicted by other evidence.  Barosh testified he left the property, and went to the ATM inside the Chinese store next to the property to withdraw money from Wezorek's bank account.  N.T. 6/25/07 at 96.  Wezorek's bank records show money was withdrawn from that location at 5:43 p.m.  Ex. P-9.

Barosh testified he spent the entire evening at Cavanaugh's at 119 South 39th Street, Philadelphia.  N.T. 6/25/07 at 94-101.  Barosh and McCarty gave strikingly similar versions of the World Series baseball game that was playing on television at the bar that night: each essentially testified that the game went beyond 1:00 a.m., and that each did not really follow baseball.[10]  Compare N.T. 6/25/07 at 100-101 with N.T. 6/25/07 at 230-31.  Wezorek's bank

---

[10]  Game three of the 2005 Major League Baseball World Series set the record for the longest World Series game, in length, not innings, at five hours and forty-one minutes.  See Scott Merkin, Blum homer gives White Sox 3-0 lead, available at http://mlb.mlb.com/news/gameday_recap.jsp?ymd=20051025&content_id=1259144&vkey=recap&fext=.jsp&c_id=cws (last visited June 29, 2007).  The game ended seven runs to five.  Id.

records show an ATM withdrawal that night at Cavanaugh's at 11:56 p.m.[11]  Ex. P-9.   Barosh

testified he left the bar around 1:30 a.m., N.T. 6/25/07 at 101 - - on rebuttal he said he may have

left at 2 or 2:30 a.m., N.T. 6/27/07 at 210 - - and then walked around a bit to "sober up" for the

drive home, N.T. 6/25/07 at 101-102.   From Cavanaugh's, it took Barosh approximately 10

minutes to get to the property.   See Ex. D-34 (the opposite trip takes an estimated seven

minutes); N.T. 6/27/07 at 214.   When he arrived, he saw the property had burned down.   N.T.

6/25/07 at 102.

Barosh did not call the police; he did not call Wezorek; he did not call the fire

department.   N.T. 6/27/07 at 210-11.   Instead, he drove to the Blue Moon Hotel at 5101

Westminster Avenue, Philadelphia, which he described in a pre-trial statement as a "whore

house."[12]  N.T. 6/27/07 at 208-09; Ex. D-25 at 76.   It was the only place he could think to sleep

in the area, N.T. 6/27/07 at 212-13, notwithstanding an abundance of motels and hotels within

easy driving distance.   The Blue Moon Hotel registry shows Barosh checked in at 12:20 a.m., on

October 26.   Ex. D-10; N.T. 6/26/07 at 163-64.   Barosh testified he paid some of the people

congregating in the Blue Moon lobby to get him travel-sized soap and shampoo, along with other

necessities.   N.T. 6/27/07 at 175, 206-07.

Although Barosh said he was worried about people looting the burned property, when he

awoke at 9 a.m., on October 26, he waited nearly four hours - - until 12:20 p.m. - - to check out

---

Barosh remembered this as a "blow out."  N.T. 6/25/07 at 100; see also Ex. D-25 at 63 (in an
interview with Allstate investigators on November 10, 2005, Barosh said he "had been tracking
the World Series.").

[11] Barosh apparently used funds to which Wezorek had given him access in order to
finance the renovations.  N.T. 6/25/07 at 107, 258-59.

[12] Josephine Baylis, who lives near the property at issue in this case, described the Blue
Moon Hotel as a place where people "turn tricks."  N.T. 6/27/07 at 42.

of the hotel.  N.T. 6/27/07 at 178, 205, 207, 210-11, 216.  He could not explain his actions during

that time.  N.T. 6/27/07 at 211-12.  The first person Barosh called after the fire was his attorney.

N.T. 6/27/07 at 210-11.

Barosh testified he stayed at a hotel near King of Prussia, Pennsylvania on October 26,

2005, the night following the fire.  N.T. 6/27/07 at 176.  At his deposition, however, Barosh said

he spent a second night, October 26, 2005, at the Blue Moon because it turned out to be an

acceptable place to stay.  N.T. 6/27/07 at 208-09.

Aside from the inherently improbable nature of the foregoing, Barosh's testimony runs

headlong into two credible facts: (1) the fire was reported at 11:22 p.m., on October 25, 2005,

and the firemen were on the scene for nearly two hours, see Ex. D-2; and (2) Barosh arrived at

the Blue Moon at 12:20 a.m., on October 26, 2005, Ex. D-10; N.T. 6/26/07 at 163-64.  Barosh

could not have been at the bar until 1:30 or 2:30 a.m., as he testified, and also have checked in at

the Blue Moon at 12:20 a.m.  Moreover, crediting the Blue Moon records over the testimony of

Barosh, Barosh's version of how he discovered the fire-destroyed home could not have taken

place.  The fire department was at the property until at least 1:00 a.m.  See Ex. P-8; N.T. 6/26/07

at 68-70.  If Barosh visited the property at any time before going to the Blue Moon, he would

have arrived at the scene while the firefighters were still present.

      E.     Wezorek's insurance application with the Philadelphia Contributionship

contained misrepresentations about the commercial property next door and the fact that no

insurance policy had been cancelled within the last three years, along with inaccurate dates.[13]

---

[13] Barosh testified he did not help Wezorek with the Contributionship application.  N.T.
6/25/07 at 200.  When asked about the date of birth on the application, however, Barosh
conceded that the "wrong birth date" listed on the application was his birth date and that he was
in the insurance broker's office while Wezorek was on the phone.  N.T. 6/25/07 at 201.

See Ex. P-13; Ex. P-14. The incorrect information on the two insurance applications (Allstate application and Contributionship application) is not a reflection of the insurance agents' mistakes. Rather, the misinformation demonstrates Wezorek's and Barosh's willingness to repeatedly misrepresent the property on insurance applications.

I find Ex. P-14, which purports to be Wezorek's and Barosh's attempt to correct the misinformation on the Contributionship application, undermines the version of events recited by Wezorek and Barosh. These purported corrections left unchanged the material misrepresentations that the property was not near commercial buildings and that no policies had been cancelled.[14] Barosh, who was intimately aware of the surrounding buildings, see N.T. 6/27/07 at 157, initialed these changes and left unchanged the material misrepresentations. See Ex. P-14. If Barosh and Wezorek submitted the corrections to the Contributionship as alleged, this exhibit, along with the testimony that changes were made, does not support their testimony of any good faith attempt to correct. Instead, it shows their willingness to misrepresent the property.

Exhibits P-13 and P-14 further eviscerate any argument that Wezorek and Barosh have concerning the misinformation submitted to the Contributionship. Taken alone, P-13 demonstrates Wezorek's and Barosh's misrepresentations to the Contributionship on a host of items. Even crediting their testimony that P-14 was an attempt to correct P-13's misinformation, P-14 constitutes a re-submission of material misrepresentations that went unchanged. If P-13 was the only document submitted, the Contributionship received all of the misinformation once. If P-14 was also submitted, however, although some dates were amended, the Contributionship

---

[14] At the time the Contributionship application was submitted in October, 2005, Wezorek and Barosh were aware Allstate had cancelled a policy for the property they sought to insure with the Contributionship.

twice received Wezorek's and Barosh's misrepresentations concerning the commercial property and the previous policy cancellation.  This shows not only an awareness of the errors, but a willingness to misrepresent material information.

F.     Barosh's testimony concerning the property being listed for sale in October, 2005, conflicts with real estate agent Larry Lanci's testimony.  First, Barosh testified he agreed to list the house for sale provided that any buyer would have to wait at least a year to move into the property because Wezorek would be residing in the home.  N.T. 6/25/07 at 199.  Lanci's unbiased testimony revealed Barosh had no such plan.  To the contrary, the property was listed for sale with no caveat regarding the move-in date.[15]  See N.T. 6/26/07 at 176.  Second, the house was not being remodeled as a single-family dwelling, as Barosh testified; Lanci testified the house was being set up as a duplex with separate entrances - -  which were evident from Lanci's viewing the property - - in order to maximize the sale price.  N.T. 6/26/07 at 174-75.  The property's status as a duplex is supported by Ex. D-13, which shows Barosh accepted a security deposit with Jack, Inc. as landlord for units A and B at the property.  See Ex. D-13.

G.     The photographs of the property, which were introduced to show the condition of the home when Barosh sought insurance from Allstate, and the condition before the fire, undermine Barosh's version of events.  First, Barosh's explanation why the date stamps on the photographs should be ignored is undercut by the photographs themselves.  Barosh explained the dates were inaccurate because he did not know how to program the date setting on his camera.  The pictures, however, contain the following date stamps:  06/01/2002, 19/01/2002, 18/01/2002, 05/01/2002, and 03/01/2002.  Ex. P-3, P-15.  Some pictures contain no date stamps.

_____

[15] Barosh's version defies common sense, i.e., that a buyer would purchase the property and wait a full year before occupying it.  Moreover, Wezorek seemed unaware that her move to Southwest Philadelphia would be only temporary.  See N.T. 6/25/07 at 263-64.

Id.  Barosh did not explain why his camera would stamp the photographs with random dates, nor why, in the face of his inability to decipher the protocol necessary to set the proper date, some photographs bear dates while others do not.

Second, the photographs in Ex. P-15, which Barosh alleged were taken on two days in August, 2005, further undermine Barosh's credibility.  Barosh testified that Ex. P-3 - - a binder that, among other documents, includes several pictures of the property in ill repair and in various states of remodeling - - was shown to Torres during the insurance application process in September, 2005.  N.T. 6/25/07 at 50-56.  Barosh could not explain, however, why the pictures in Ex. P-15, allegedly taken before the insurance was sought, which show a home partially furnished with televisions, rugs, couches, lamps, beds, and other accessories, were not shown to Torres.  Instead, Barosh testified the photographs in Ex. P-3, which show a home utterly devoid of furnishings, were given to Torres in the pursuit of an insurance policy.

H.     Barosh's credibility is further weakened by the evidence concerning Yolanda Dingle's occupancy of the home.  Wezorek and Barosh represented to Allstate that the home would be owner occupied.  Ex. D-22 (Wezorek initialed the application); N.T. 6/26/07 at 36-37; Ex. D-23 at 16, 18, 27-28, 31-32.  This representation continued at trial.  Barosh testified that he had a problem with a "squatter" a month before seeking insurance from Allstate, and that he enlisted the help of the police to remove the woman.  Compare N.T. 6/25/07 at 46-48 with D-23 at 38-39 (after the policy was issued, Barosh told Torres about a squatter).  Exhibit D-13, however, shows Barosh was willing to lease the property to Yolanda Dingle for a year, beginning in August, 2005.  See Ex. D-13 (un-executed lease).  Barosh even accepted a security deposit from Dingle.  See id.; N.T. 6/25/07 at 47.  Moreover, instead of listing Wezorek as landlord, the lease listed Jack, Inc., a company affiliated with Barosh, as landlord.  Ex. D-13.

-17-

Lieutenant Ramsauer, a fire marshal with the Philadelphia Fire Department, testified that when he arrived on the scene of the fire on October 25, 2005, he noticed an excited woman on the street outside the home.  N.T. 6/26/07 at 60-61, 91-92, 98-103.  The woman, Yolanda Dingle, said she had been living in the home until Chris Barosh "put her out."  Id.  She said Barosh would not return her furniture, and it was burning in the fire.[16]  Id.

   I. Barosh testified that Ex. P-3, a binder referred to as "the book," which includes the deed to the property, receipts, pictures of the property, and other items, was the item given to Torres to show the condition of the house.  N.T. 6/25/07 at 49-50, 56, 58.  Later in his testimony, Barosh identified the appraisal as an item that was in the book when he showed it to Torres, but not in Ex. P-3 at trial.  N.T. 6/25/07 at 62-66.  On cross-examination, Barosh revealed that Ex. P-3 was not the only binder he used to keep records, and that the other book was destroyed in the fire.  N.T. 6/25/07 at 140.

## Conclusions of Law

A. Introduction

   1. Pennsylvania courts have "adopted the Restatement (Second) of Agency regarding the liability of a principal for the tortious misrepresentations of his agents," which is found in § 257.  Gilmour v. Bohlmueller, 2005 WL 241181 at *4 (E.D. Pa. Jan. 27, 2005) (Padova, J.) (citing Bolus v. United Penn Bank, 525 A.2d 1215, 1213 (Pa. Super. 1987)).[17]  Restatement (Second) of Agency § 257 provides:

---

  [16] During Lt. Ramsauer's testimony, Dingle's statement was offered as an excited utterance.  See Fed. R. Evid. 803(2).  After the proper foundation was established, I found limited portions of the statement to be excited utterances.

  [17] Pennsylvania substantive law applies in this diversity case.  See Erie R.R. v. Tompkins, 304 U.S. 64 (1938).

A principal is subject to liability for loss caused to another by the other's reliance upon a tortious representation of a servant or other agent, if the representation is:

     (a) authorized;

     (b) apparently authorized; or

     (c) within the power of the agent to make for the principal.

Restatement (Second) of Agency § 257.[18]

2.     Moreover, Pennsylvania adopted § 261, see Bowman v. Home Life Ins. Co., 243 F.3d 331, 334 (3d Cir. 1957), which provides: "A principal who puts a servant or other agent in a position which enables the agent, while apparently acting within his authority, to commit a fraud upon third persons is subject to liability to such third persons for the fraud."  Restatement (Second) of Agency § 261.  The Supreme Court of Pennsylvania recognized "[many cases] instruct us that a principal is liable to third parties for the frauds, deceits, concealments, misrepresentations, torts, negligences and other malfeasances and misfeasances of his agent committed within the scope of his employment even though the principal did not authorize, justify, participate in or know of such conduct or even if he forbade the acts or disapproved of them, as long as they occurred within the agent's scope of employment."  Aiello v. Ed Saxe Real Estate, Inc., 499 A.2d 282, 559 (Pa. 1985); see also Bowman, 243 F.2d at 334.

3.     Section 143 of the Restatement (Second) of Agency provides:

Upon ratification with knowledge of the material facts, the principal becomes responsible for contracts and conveyances made for him by one purporting to act on his account as if the transaction had been authorized, if there has been no supervening loss of capacity by the principal or change in the law which would render illegal the authorization or performance of such a transaction.

4.     Wezorek gave Barosh complete control over the property.  See N.T. 6/25/07 at

---

[18] Restatement (Second) of Agency § 140, which concerns the ability of an agent to bind the principal to a contractual obligation, contains language nearly identical to § 257.

260-61.  Moreover, she instructed Barosh to get insurance for the property, and later granted

Barosh power of attorney.  Wezorek fully supported Barosh's actions even after Allstate alleged

he defrauded it in the pursuit of homeowner's insurance.  Moreover, many of Barosh's assertions

were included in the insurance applications Wezorek signed for Allstate and the Philadelphia

Contributionship.  As a result, Wezorek is responsible for the actions of Barosh.  See Aiello, 499

A.2d at 559; Rest. (Second) of Agency § 143; see also Pl.'s Proposed Conclusions of Law at 6,

para. 2 ("Barosh acted as plaintiff's agent . . .").

B.    Plaintiff's claims

           Breach of insurance contract based on Allstate's failure to pay claim for real estate
           and personal property losses

5.    To establish a breach of contract, Wezorek must show:  (1) the existence of a

contract and its essential terms, (2) breach of a duty imposed by the contract, and (3) the damages

that result.  Lackner v. Glosser, 891 A.2d 21, 30 (Pa. Super. 2006) (citing Gorski v. Smith, 812

A.2d 683, 692 (Pa. Super. 2002)).   An insurer, however, does not breach a contract where the

insurance policy was properly rescinded.

6.    Pennsylvania recognizes a common law right of insurers to rescind an insurance

policy that was procured through fraud.  See Jung v. Nationwide Mut. Fire Ins. Co., 949 F. Supp.

353, 359-60 (E.D. Pa. 1997) (Cahn, C.J.) (citing Metropolitan Property and Liability Ins. Co. v.

Insurance Commissioner, 580 A.2d 300 (Pa. 1990)); New York Life Ins. Co. v. Brandwene, 172

A. 669, 670 (Pa. 1934) (it has long been established that "[w]here the execution of a contract of

insurance has been induced by fraudulent misrepresentations of the insured, the insurer may

secure its cancellation").  Likewise, "Pennsylvania courts have long ruled that a violation of the

fraud and concealment provision of an insurance policy . . . serves as a complete bar to the

insured's recovery under the policy."  Millard v. Shelby Casualty Ins. Co., 2005 WL 2035860 at

*4 (M.D. Pa. Aug. 24, 2005) (Vanaskie, C.J.).

7.      An insurance policy may be rescinded if "(1) the application contained a misrepresentation, (2) the misrepresentation was material to the risk being insured, and (3) the insured knew that the representation was false when made, or the insured made the representation in bad faith." Jung, 949 F. Supp. at 356 (citing New York Life Ins. Co. v. Johnson, 923 F.2d 279, 281 (3d Cir. 1991); American Franklin Life Ins. Co. v. Galati, 776 F. Supp. 1054, 1059 (E.D. Pa. 1991)). The insurer must prove all three elements by clear and convincing evidence. Justofin v. Metropolitan Life Ins. Co., 372 F.3d 517, 521 (3d Cir. 2004) (citing Batka v. Liberty Mut. Fire Ins. Co., 704 F.2d 684, 687 (3d Cir. 1983)). "Information is . . .  material if knowledge or ignorance of it would naturally influence the judgment of the insurer in issuing the policy, in estimating the degree and character of the risk, or in fixing the premium rate." A.G. Allebach, Inc. v. Hurley, 540 A.2d 289, 295 (Pa. Super. 1988).

8.      "[F]raud consists of anything calculated to deceive, whether by single act or combination, or by suppression of truth, or suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or silence, word of mouth or look or gesture." Rohm and Haas Co. v. Continental Casualty Co., 781 A.2d 1172, 1179 (Pa. 2001) (quoting Moser v. DeSetta, 589 A.2d 679, 682 (1991)). "It is sufficient to show that [the misrepresentations] were false in fact and that insured knew they were false when he made them, since an answer known by insured to be false, when made is presumptively fraudulent." Baldwin v. Prudential Ins. Co., 258 A.2d 660, 662 (Pa. Super. 1969) (internal citations omitted) (quoting Evans v. Penn Mutual Life Ins. Co., 186 A. 133, 138 (Pa. 1936)). Fraudulent intent may be inferred where "false answers [are] given under such circumstances that [the actor] must have been aware of their falsity." Hepps v. Gen. Am. Life Ins., 1998 WL 564497 at *4 (E.D. Pa. Sept. 2, 1998) (Shapiro,

J.) (quoting <u>Derr v. Mutual Life Ins. Co.</u>, 41 A.2d 542, 544 (Pa. 1945)); <u>Allstate Ins. Co. v. Kelly</u>, 2007 WL 403919 at *4 (W.D. Pa. Feb. 1, 2007) (Gibson, J.).

9.     Wezorek's breach of contract claim fails because Allstate properly voided the policy ab initio.  The policy contained a clause allowing Allstate to rescind the policy where it was obtained through misrepresentation or fraud.  Allstate exercised this right because Wezorek, through her accomplice Barosh, misrepresented when the home was purchased, that it was owner occupied, and that there was prior insurance.  Wezorek made misrepresentations that Allstate relied on to void the policy, and she also misrepresented that no commercial properties were within 40 feet, that she had moved into the property in September, 2005, that the purchase price of the home was $70,000, and that the home had new fire alarms.

10.     The misrepresentations identified by Allstate in voiding the policy were material.

A.     Allstate would not have issued a homeowner's policy if it had known the insured, Wezorek, would not occupy the property within 30 days.  Allstate's witnesses explained that there are different policies for different uses of the property.  The use of the property affects the premium and the risk involved, and thus, the representation of the use is material.  See <u>A.G. Allebach, Inc.</u>, 540 A.2d at 295.

B.     Allstate would not have issued this policy if it had known the home was not insured from the purchase in July, 2005, until the time of the application.  Allstate explained it is not their policy to buy unknown risks that could result in providing insurance to a property that may have a preexisting loss.  This fact would influence Allstate's willingness to insure a property, i.e., because it would alter the risk analysis.  Therefore, it is material.  See <u>A.G. Allebach, Inc.</u>, 540 A.2d at 295.

11.     The falsity of the misrepresentations was known to both Barosh and Wezorek when the misrepresentations were made.

A.      Both Wezorek and Barosh knew Wezorek would not occupy the property within 30 days.  Although Wezorek claimed she and Barosh told Torres she would not occupy the property for 60 days, I do not find this testimony credible.  Wezorek knew her living and working situations and testified she did not intend to move until November.  Thus, when she signed the application containing the misrepresentation that she would occupy the property within 30 days, while knowing it was false, it constituted fraud.  See Rohm and Haas Co., 781 A.2d 1172 at 1179.  Wezorek's failure to notify her employers that she would be moving, not that she was considering it, shows she had not finalized plans to occupy the premises within 60 days, if ever.  Moreover, Barosh was busy converting the home into two units, instead of the single family home he testified he and Wezorek would occupy, and taking steps that would have made it impossible for Wezorek to move into the property by trying to sell or lease the property.

B.      Barosh knew when the property was purchased - - he signed the deed.  Moreover, he was intimately involved with the property and knew it was not insured.  Likewise, Wezorek knew the property had been purchased and that Barosh had been renovating it for some time before Barosh attempted to obtain insurance.  See N.T. 6/25/07 at 32 (Wezorek told Barosh she would like to move in after 60 days, so he should get insurance).  Thus, when Wezorek signed the application with the improper purchase date, she knowingly misrepresented that fact to Allstate, which constituted fraud.  See Rohm and Haas Co., 781 A.2d 1172 at 1179.

12.     Wezorek and Barosh continued these fraudulent, material misrepresentations in the presentation of the insurance claim to Allstate.[19]

13.     Because Wezorek made fraudulent misrepresentations that were material to the

---

[19] When presenting the claim, Barosh made other misrepresentations concerning the events on the night of the fire, but these did not form the basis of Allstate's decision to void the policy.

risk to be insured, which she knew - - or, at a minimum, her accomplice Barosh knew - - were false when made; I find by clear and convincing evidence Allstate was entitled to rescind its policy.  Wezorek's claims for breach of contract for real property damages and personal property damages fail.

<u>Bad faith</u>

14.     Under Pennsylvania law, a claim that an insurer acted in bad faith must be proven by clear and convincing evidence.  <u>Polselli v. Nationwide Mut. Fire Ins. Co.</u>, 23 F.3d 747, 750-51 (3d Cir. 1994) (citing <u>Cowden v. Aetna Casualty and Surety Co.</u>, 134 A.2d 223, 229 (Pa. 1957)). "[T]he clear and convincing evidence standard requires evidence that is 'so clear, direct, weighty, and convincing as to enable the [fact-finder] to come to a clear conviction, without hesitancy, of the truth of the precise facts [in dispute].'" <u>Commonwealth v. Maldonado</u>, 838 A.2d 710, 715 (Pa. 2003) (quoting <u>Rohm and Haas Co.</u>, 781 A.2d at 1179).  "[S]harp conflicts in the testimony," however, do not preclude a finding by clear and convincing evidence.  <u>In re Estate of Fickert</u>, 337 A.2d 592, 594 (Pa. 1975).

15.     Pennsylvania's bad faith statute, 42 Pa. Cons. Stat. Ann. § 8371, provides:

In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:

(1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.
(2) Award punitive damages against the insurer.
(3) Assess court costs and attorney fees against the insurer.

16.     Although the statute does not define bad faith, the United States Court of Appeals for the Third Circuit has found "bad faith" in the insurance context has acquired a "peculiar and universally acknowledged meaning." <u>Polselli</u>, 23 F.3d at 751.  The Third Circuit explained:

'Bad Faith' on the part of insurer is any frivolous or unfounded refusal to pay proceeds of a policy; it is not necessary that such refusal be fraudulent.  For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means a breach of a known duty . . . through some motive of self-interest or ill will; mere negligence or bad judgment is not bad faith.

Id.; see also Terletsky v. Prudential Property and Casualty Ins. Co., 649 A.2d 680, 688 (Pa. Super. 1994).

17.     To recover for bad faith, a plaintiff must show the insurer "(1) did not have a reasonable basis for denying benefits under the policy and (2) knew or recklessly disregarded its lack of a reasonable basis in denying the claim."  Condio v. Erie Ins. Exchange, 899 A.2d 1136, 1143 (Pa. Super. 2006) (citing Terletsky, 649 A.2d at 688); see also O'Donnell v. Allstate Ins. Co., 734 A.2d 901, 906 (Pa. Super. 1999); Horowitz v. Federal Kemper Life Assurance Co., 57 F.3d 300, 307-08 (3d Cir. 1995) (bad faith claim fails where insurer had reasonable basis to deny the claim).  "Mere negligence or bad judgment is not bad faith."  Id. at 1143.  Moreover, an incorrect analysis of the law, without more, does not establish bad faith.  Jung, 949 F. Supp. at 356.

18.     To defeat a bad faith claim, an insurer need only show it had a reasonable basis for believing that the three-part test used to determine the propriety of rescinding the insurance contract was met.  Jung, 949 F. Supp. at 356 (citing Terletsky, 649 A.2d at 688).

19.     Allstate not only had a reasonable basis for believing it could lawfully rescind the policy based on material misrepresentations in the application, it was legally correct in doing so. Its refusal to cover the loss was not frivolous or unfounded.  Thus, because I have found Allstate properly rescinded the insurance contract based on material misrepresentations that were known to Wezorek and Barosh, and Allstate performed a reasonable and proper claims investigation, Wezorek has not proven Allstate acted in bad faith.  Wezorek's bad faith claim fails under any

-25-

theory or under any view of the evidence.

C.    <u>Defendant's counterclaim alleging insurance fraud</u>

20.    Pennsylvania law provides for a civil action for insurance fraud, which allows an insurer to "recover compensatory damages, which may include reasonable investigation expenses, costs of suit and attorney fees." <u>See</u> 18 Pa. Cons. Stat. Ann. § 4117(g).  Moreover, "[a]n insurer may recover treble damages if the court determines that the defendant has engaged in a pattern of violating this section."[20] <u>Id.</u>  Insurance fraud is committed where a person:

---

[20] Prior to 1994, § 4117(g) provided:

> An insurer damaged as a result of a violation of this section may sue therefor in any court of competent jurisdiction to recover compensatory damages, which may include reasonable investigation expenses, costs of suit and attorney fees. An insurer may recover damages if the court determines that the defendant has engaged in a pattern of violating this section.

18 Pa. Cons. Stat. Ann. § 4117(g) (1993).  In 1994, the Pennsylvania legislature amended § 4117(g), 1994 Pa. Legis. Serv. Act 1994-165 (S.B. 849), which changed the required showing an insurer must make to recover compensatory damages under the statute.  The amendment added the word "treble," so that § 4117(g) now provides:

> An insurer damaged as a result of a violation of this section may sue therefor in any court of competent jurisdiction to recover compensatory damages, which may include reasonable investigation expenses, costs of suit and attorney fees. An insurer may recover <i>treble</i> damages if the court determines that the defendant has engaged in a pattern of violating this section.

18 Pa. Cons. Stat. Ann. § 4117(g) (1995) (emphasis added).  Thus, proof of a "pattern" of fraud is now required only to collect treble damages and not to collect compensatory damages.

In <u>Peer v. Minnesota Mutual Fire & Casualty Co.</u>, 1995 WL 141899 at *13 (E.D. Pa. Mar. 27, 1995), the Honorable Jan DuBois applied the pre-1994 version of § 4117(g) - - to acts done prior to the statute's amendment - - to require proof of a pattern of violations for an insurer to recover for insurance fraud.  In the cases that followed, which interpreted the amended version of § 4117(g), the "pattern" requirement was carried forward.  <u>See e.g.</u> <u>Ferrino v. Pacific Indem. Co.</u>, 1996 WL 32146 at *4 (E.D. Pa. Jan. 24, 1996) (Smith, M.J.) (multiple misrepresentations in one claim do not establish pattern); <u>Parasco v. Pacific Indem. Co.</u>, 920 F. Supp. 647, 657 (E.D. Pa. 1996) (Joyner, J.) (multiple actions in one claim do not establish pattern); <u>Zell v. Federal Ins. Co.</u>, 2007 WL 1875803 at *12 (W.D. Pa. June 27, 2007) (McVerry, J.) (collecting authorities).

(2) Knowingly and with the intent to defraud any insurer or self-insured, presents or causes to be presented to any insurer or self-insured any statement forming a part of, or in support of, a claim that contains any false, incomplete or misleading information concerning any fact or thing material to the claim.

(3) Knowingly and with the intent to defraud any insurer or self-insured, assists, abets, solicits or conspires with another to prepare or make any statement that is intended to be presented to any insurer or self-insured in connection with, or in support of, a claim that contains any false, incomplete or misleading information concerning any fact or thing material to the claim, including information which documents or supports an amount claimed in excess of the actual loss sustained by the claimant.

18 Pa. Cons. Stat. Ann. § 4117(a).

21.     Insurance fraud must be proven by clear and convincing evidence.  See Tudor Ins. Co., 697 A.2d at 1016.

22.     A person violates Pennsylvania's insurance fraud statute by: "(1) presenting false, incomplete or misleading statements to [the insurer]; 2) that were material to the claim;" and 3) which were knowingly made with an intent to defraud.  Allstate Ins. Co., 2007 WL 403919 at *4 (citing Hepps, 1998 WL 564497 at *3).

23.     Fraudulent intent may be inferred where "false answers [are] given under such circumstances that [the actor] must have been aware of their falsity."  Hepps, 1998 WL 564497 at *4 (quoting Derr, 41 A.2d at 544); Allstate Ins. Co., 2007 WL 403919 at *4.  "It is sufficient to

---

Because the amendment of § 4117(g) to limit the mention of damages in the second sentence to "treble damages" eliminated the requirement that a pattern be shown to recover for compensatory damages, the current version of § 4117(g) no longer requires a showing of a pattern of violations to recover for compensatory damages.  Cf. Brewster v. Gage, 280 U.S. 327, 337 (1930) ("The deliberate selection of language so differing from that used in . . . earlier Acts indicates that a change of law was intended."); Commonwealth v. Berryman, 649 A.2d 961, 965 (Pa. Super. 1994) (under Pennsylvania law, "where a section of a statute contains a given word, the omission of such word from a similar section of the statute shows a different legislative intent."); see Allstate Ins. Co., 2007 WL 403919 at *4 (court found statute was violated without a pattern of violations).

show that [the misrepresentations] were false in fact and that insured knew they were false when he made them, since an answer known by insured to be false, when made is presumptively fraudulent." Baldwin, 258 A.2d at 662 (internal citations omitted) (quoting Evans, 186 A. at 138).

24.     A fact is material during the insurance application process "if knowledge or ignorance of it would naturally influence the judgment of the insurer in issuing the policy, in estimating the degree and character of the risk, or in fixing the premium rate." A.G. Allebach, Inc. v. Hurley, 540 A.2d 289, 295 (Pa. Super. 1988).   Likewise, during the course of a claim investigation, "[a] statement is material if it 'concerns a subject relevant and germane to the insurer's investigation as it was then proceeding,' or 'if a reasonable insurance company, in determining its course of action, would attach importance to the fact misrepresented.'" Hepps, 1998 WL 564497 at *4 (quoting Parasco, 920 F. Supp. at 654).

25.     Wezorek and Barosh embarked on a plan to deceive Allstate concerning the occupancy and use of the home from the outset, which culminated in an incendiary fire.  Barosh continued the deception through his misrepresentations concerning his whereabouts on the night the fire was set.  Substantial evidence demonstrates Barosh's and Wezorek's quest to obtain and retain homeowner's insurance at the cost of the truth, including, e.g., their continuing misrepresentations of the property to Allstate and the Philadelphia Contributionship and their production of Exhibits P-4 and P-5 only after they knew Torres was not available.

26.     It is uncontested that Wezorek filed a claim for personal and real property losses under the Allstate homeowner's policy.

27.     The representations made by Barosh, and adopted by Wezorek, in the application are subsumed in the claim for personal and real property losses submitted to Allstate.  Thus, any

misrepresentations made to obtain the insurance policy would violate § 4117(a)(2) & (3).  Cf. Allstate Ins. Co., 2007 WL 403919 at *4 (summary judgment entered based on misrepresentations made in insurance application).

28.     Barosh and Wezorek knowingly and with intent to defraud Allstate misrepresented when the home was purchased, whether it had prior insurance, and that the home would be owner occupied within 30 days.  See supra Conclusion of Law Nos. 9-13 (Wezorek and Barosh knew the representations were false when the application was submitted, and the misrepresentations were material to the risk being insured).

29.     Barosh knowingly and with intent to defraud Allstate misled Allstate regarding his attempt to rent the home to Yolanda Dingle.  Lt. Ramseur's testimony concerning Dingle's excited utterance that her belongings were in the home, Erik Melling's testimony that Barosh attempted to rent the home, Torres' statement that Barosh mentioned a squatter, and the lease listing Dingle as lessee all demonstrate Barosh's intention to rent the home, rather than use it as a residence for Wezorek.  The homeowner's policy did not provide for the home's use as a rental property, and Barosh made every effort to conceal Dingle's status with the home to Allstate.

30.     The fraudulent misrepresentations were material to the claimed fire loss because they formed the basis for the insurance policy.  See A.G. Allebach, Inc., 540 A.2d at 295.  The misrepresentations on the insurance application were designed to deceive Allstate to allow Wezorek to obtain homeowner's insurance that was unobtainable, i.e., Allstate would not have offered homeowner's insurance where the homeowner would not occupy the home within 30 days, and where there was no prior insurance.  Moreover, the occupancy of the home, e.g., whether Dingle resided in the home, was material to the claim investigation because determining who occupied the home at the time of the fire was important in determining who set the fire, and

in determining who owned the personal property destroyed in the fire.

31.     Barosh knowingly, and with intent to defraud Allstate, concealed, mislead, and misrepresented his whereabouts on the night of the fire and during the early morning hours the following day.  His version of events is incredible.  See supra Finding of Fact No. 40; see also D-25 (Barosh's statements to the Allstate investigator on November 10, 2005 misrepresented his whereabouts on the night of the fire).

32.     Barosh's statements concerning his whereabouts were material, i.e., relevant and germane, to the insurance claim because the fire was started in the home by an open flame applied to gasoline.  See Hepps, 1998 WL 564497 at *4.  An occupant's whereabouts at the time a fire destroys an insured property is critical to an insurer's investigation into the cause of the fire, including who set the fire.  Had Allstate found Wezorek, and/or Barosh acting as Wezorek's agent, intentionally set the fire, the fire would not have been covered by the insurance policy.

33.     As a result, I find by clear and convincing evidence that Barosh and Wezorek committed insurance fraud in violation of § 4117(a)(2) & (3).

An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JILL WEZOREK,** | : | CIVIL ACTION |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **ALLSTATE INSURANCE COMPANY,** | : | NO. 06-CV-1031 |
| **Defendant** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **CHRISTOPHER BAROSH,** | : | |
| **Counterclaim Defendant** | : | |

## ORDER

AND NOW, this 6th day of August, 2007, after a bench trial on June 25, 2007 through June 27, 2007, and upon consideration of the parties proposed findings of fact and conclusions of law, it is hereby ORDERED that:

1.     Judgment is entered in favor of defendant Allstate and against plaintiff on plaintiff's claims.  Allstate properly voided Wezorek's insurance policy ab initio and did not act in bad faith.

2.     Judgment is entered in favor of Allstate on its counterclaim.  Judgment is entered against counterclaim defendants Jill Wezorek and Christopher Barosh.

3.     No later than August 17, 2007, Allstate shall submit sufficient proof of the damages it sustained as a result of Barosh's and Wezorek's fraudulent acts, as permitted by 18 Pa. Cons. Stat. Ann. § 4117(g).  Barosh and Wezorek shall file any response no later than August 24, 2007.

BY THE COURT:


  /s/ Timothy R. Rice
TIMOTHY R. RICE
U.S. MAGISTRATE JUDGE